# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Ricky Butler,<br>      Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | 1:18cv1525 (TSE/JFA) |
| Northern Neck Regional Jail, et al.,<br>      Defendants. | )<br>)<br>) | |

## MEMORANDUM OPINION

Proceeding pro se, federal prisoner Ricky Butler initiated this suit against twenty-one individuals employed by or associated with Northern Neck Regional Jail ("NNRJ") under 42 U.S.C. § 1983.[1] Plaintiff's allegations relate to the conditions of his confinement as well as defendants' actions and omissions, all of which plaintiff contends were unconstitutional and contrary to state law. See Dkt. No. 1. Thirteen defendants[2] have filed a motion for summary judgment, arguing that no constitutional violation occurred and that plaintiff's self-injurious behavior necessitated all of the actions that they took with regard to plaintiff and to the circumstances in which he was confined. See Dkt. Nos. 45-47. Plaintiff, having been provided the notice required by Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1985), filed an opposition to defendants' motion, supported by hundreds of pages of handwritten

---

[1] Plaintiff initiated this suit while in the custody of the United States Marshals Service. For a time, he was held at NNRJ while awaiting trial and sentencing for criminal proceedings underway in the Western District of New York. Plaintiff has since been sentenced and is currently incarcerated at FCI-Butner, in North Carolina. See Dkt. No. 70.

[2] As discussed in the order on plaintiff's motion for clarification, filed contemporaneously with this Memorandum Opinion, the remaining eight defendants have not been served because plaintiff has been unable to provide sufficient identifying information to permit service.

documents. See Dkt. No. 58. The matter has thus been adequately briefed and is ripe for disposition.

For the reasons that follow, the factual record demonstrates that there are no genuine disputes of material fact with regard to the majority of the claims and defendants, and that those defendants are entitled to judgment as a matter of law. By contrast, on the current summary judgment record, a genuine issue of fact exists as to the failure to protect and state negligence claims against defendant Christopher Laws, Jr. Accordingly, summary judgment must be denied with respect to the failure to protect and state negligence claims against Officer Laws, Jr. and must be granted in all other respects.

## I. Background

*A.*     *Determining the Content of the Factual Record*

Before adjudicating the motion for summary judgment, the factual record on which the motion will be considered must be clarified. This determination requires an examination of the extent to which the parties complied with Local Civil Rule 56. The local rule requires that a motion for summary judgment include a section listing all material facts that the moving party contends are not genuinely disputed. See Local Civ. R. 56(B). The nonmovant must then respond to each assertion of fact, indicating whether he believes that fact is in dispute. Id. When claiming the existence of a dispute, the nonmovant must cite to admissible evidence in the record supporting that claim. Id. The nonmovant's provision of an alternative factual narrative without citation to the record does not demonstrate the existence of a disputed fact; instead, such a response will result in the movant's asserted fact being admitted. See Integrated Direct Marketing, LLC v. May, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015).

The parties' compliance with Local Civil Rule 56(B) in this case was mixed. Defendants complied with the rule while plaintiff has done so only in part. While it is true that plaintiff, the nonmovant, specifically rejected defendants' proffered version of events, in many instances he failed to cite to admissible evidence in the record when doing so. Indeed, as explained below, the vast majority of the exhibits that plaintiff offers in opposition to defendants' motion do not constitute admissible evidence.[3]

Plaintiff refers to five of his sixteen exhibits as "summaries" of other documents.[4] These exhibits are handwritten and are seemingly designed to reduce apparently relevant information from a large number of documents into a digestible format. Rule 1006 of the Federal Rules of Evidence allows for the admission of summaries to serve "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence," thereby "reduc[ing] the volume of written documents that are introduced into evidence." United States v. Janati, 374 F.3d 263, 272 (4th Cir. 2004).

The proponent of summary evidence bears the burden of establishing that the documents on which the summary is based would themselves be admissible.[5] Here, plaintiff has failed to

---

[3] The two exceptions to this statement are plaintiff's verified complaint and plaintiff's Exhibit J, which consists of printouts of Virginia state statutes. A court may simply take notice of state laws; plaintiff need not make a showing as to their admissibility. See Fed. R. Evid. 201(b)-(c). Additionally, in response to defendants' motion to strike, plaintiff's "medical expert report" was previously deemed inadmissible. This Memorandum Opinion shall therefore not address the admissibility of that filing.

[4] As Exhibit A to his opposition to defendants' motion, plaintiff offers what he calls a "Medical Evidence Summary." See Dkt. No. 58-1. As Exhibit B, plaintiff offers a "Mental Health Note Summary." See Dkt. No. 58-2. Exhibit C is entitled "Incident Report Summary." See Dkt. No. 58-3. Exhibit D is entitled "Summary of Log Book Entries of Security Check Times." See Dkt. No. 58-4. Exhibit O is entitled "Restraint Chair Summaries." See Dkt. No. 58-15.

[5] See United States v. Oros, 578 F.3d 703, 708 (7th Cir. 2009) ("[I]n applying [Rule 1006], we require the proponent of the summary to demonstrate that the underlying records are accurate and would be admissible as evidence."); United States v. Irvin, 682 F.3d 1254, 1262 (10th Cir.

establish that his summary submissions constitute admissible evidence. "To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)—that the documents be admissible in evidence." Miskin v. Baxter Healthcare Corp., 107 F. Supp. 2d 669, 671 (D. Md. 1999) (citing Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993)). Plaintiff has included no such affidavit in his filings and has thus failed to demonstrate that the evidence he has submitted is admissible.[6]

Plaintiff's showing as to the admissibility and reliability of the other exhibits he offers as evidence is equally deficient. Exhibit E, for example, is entitled "Copy of Pages in Log Book." See Dkt. No. 58-5. These pages do not appear to have been authored by plaintiff—the handwriting is visibly different—but exactly who authored these pages is not clear. Moreover, plaintiff admits that he "marked relevant entries with arrows meant as a guide." See Dkt. No. 58-5. Consequently, the pages that make up this exhibit are not only penned by an unknown author but have also been altered by plaintiff. They are therefore not true and accurate copies of the originals, and it cannot be concluded that they are reliable or trustworthy. Additionally,

---

2012) ("[J]ust as the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception ... so too must the proponent of a Rule 1006 summary based on hearsay evidence establish that the materials summarized are admissible."); United States v. Ging-Hwang Tsoa, No. 1:13cr137 (JCC), 2013 WL 6145664, at *6 (E.D. Va. Nov. 20, 2013) (same).

[6] Defendants offer one "summary" exhibit. See Dkt. No. 47-3. Defendants' summary exhibit details plaintiff's medical records from the time period relevant to the allegations in plaintiff's complaint. But, unlike plaintiff, defendants made the necessary showing that the documents on which their summary was based are admissible as business records. Indeed, through an affidavit authored by Ted Hull, Superintendent of NNRJ, defendants establish that the summary they offer is based on records made and maintained by NNRJ in the regular course of business and that the summary is a true and accurate reflection of the actual underlying records. Accordingly, the summary evidence proffered by defendants is admissible and properly considered at summary judgment.

plaintiff once more has failed to include an affidavit authenticating these documentary exhibits. This represents another ground for finding inadmissible plaintiff's submissions.

Accordingly, the only admissible evidence on which plaintiff can rely is his verified complaint. Despite the fact that this represents a meager evidentiary foundation on which to oppose a motion for summary judgment, that opposition has proven, in some cases, effective.

Although, as noted, defendants largely complied with Local Civil Rule 56, they did so by relying on affidavits from the defendants themselves. Neither the affidavits nor the statement of facts cite to the robust body of documentary exhibits defendants offer in their defense. Consequently, where plaintiff's verified complaint states facts contrary to defendants' affidavits, disputes of fact arise. Because summary judgment requires courts to view the evidence in the light most favorable to the nonmovant, where defendants fail to cite to objective factual evidence in support of their position, conflicting self-serving affidavits submitted by plaintiff and defendants create triable issues of fact.

B.    *Undisputed Material Facts*

In light of the analysis above, the undisputed factual record laid out below is substantially based on the defendants' statement of undisputed facts. Plaintiff's verified complaint and opposition brief have been scoured for allegations that might be viewed as being in conflict with the facts stated here. Where such disputes exist, plaintiff's offered facts are, as stated below, largely immaterial or not supported by admissible record evidence. Where material disputes of fact exist, however, those disputes are noted.

<u>**Context and Events Predating Lawsuit**</u>[7]

1. At the time he filed the instant lawsuit, plaintiff was a pretrial detainee housed at NNRJ under the authority of the United States Marshal's Service ("USMS") for the Western District of New York.

2. At all relevant times, each defendant was appointed and employed by the Northern Neck Regional Jail Authority at NNRJ.

   a. Ted Hull served as Superintendent of NNRJ;

   b. Major Phyllis Back was the Deputy Superintendent;

   c. Captain Daryl Turner was the Chief of Security;

   d. Amy Dameron was the Director of Inmate Services;

      i. As Director of Inmate Services, Dameron was responsible for operations, but she did not make medical decisions with regard to plaintiff's care or treatment. At most, Dameron made sure medical personnel followed up with plaintiff regarding external medical appointments. She also kept the USMS apprised of plaintiff's behavior.[8]

   e. Lieutenant Luna was head of lieutenants and reported to Captain Turner;

   f. Lieutenant Newsome was a shift commander;

   g. Officers Taylor, Law Sr., Law Jr., and Gray were NNRJ Officers;

---

[7] The facts as listed here are not presented in the order that defendants presented them in their motion for summary judgment. Instead, they have been reordered to construct a more digestible narrative.

[8] Plaintiff does not dispute the facts asserted by defendant in paragraph 2(d)(i). Rather, plaintiff asserts, citing his verified complaint, that "Dameron played a crucial and intimate role in organizing the unconstitutional delay and interference of plaintiff's prompt medical treatment." Dkt. No. 58 ¶ 139. But plaintiff's verified complaint only makes conclusory allegations that Dameron played a crucial role and the complaint does not make any supporting factual allegations. Moreover, the complaint merely alleges that Dameron was aware of some of plaintiff's complaints. Accordingly, there is no genuine dispute of material fact and the fact will not be amended to add the additional information referred to by plaintiff.

h. Dr. James Dudley was employed at NNRJ as a physician;

i. Defendant Barnes was employed as an emergency medical technician ("EMT") and served as "Assistant Supervisor" of the medical department;

　　i. EMT Barnes had no direct involvement with plaintiff's medical care and cannot recall plaintiff complaining to him. EMT Barnes was made aware by NNRJ staff of events such as x-rays or other procedures scheduled for plaintiff.[9]

j. Finally, defendant Johnson was employed as a Qualified Mental Health Professional ("QMHP") at NNRJ.

3. Superintendent Hull took over took over at NNRJ twenty-five years ago and has worked closely with the USMS, housing and handling many "problem" inmates. USMS recommended NNRJ as a possible suitable detention facility for plaintiff.[10]

4. Before the alleged events foundational to this action, plaintiff was incarcerated at NNRJ between June 24, 2016 and October 5, 2016; from November 3, 2016 to January 1, 2017; and from January 9, 2017 to April 4, 2017. Plaintiff had previously been removed by request from every local facility in the greater Buffalo, New York, region, as well as facilities in Eastern Ohio.[11]

---

[9] Plaintiff also disputes defendants' account of EMT Barnes's involvement. Plaintiff's verified complaint alleges that plaintiff told EMT Barnes and other medical staff about his medical conditions and that EMT Barnes, "ever quiet and poker faced ... never made any comment." See Dkt. No. 1 ¶ 64. As explained *infra*, EMT Barnes's knowledge of plaintiff's health status is not material to the resolution of the claims raised against him. Accordingly, there is no genuine dispute of material fact with respect to paragraph 2(i)(i) above and the fact appears as phrased by defendants.

[10] Plaintiff disputes that Superintendent Hull "took over" NNRJ 25 years ago. This dispute is not material to the merits of plaintiff's claims and the fact in paragraph 3 therefore appears as phrased by defendants.

[11] Plaintiff disputes having been removed from Buffalo and Ohio jails at those jails' request and states instead that he requested to be removed from those institutions. Plaintiff does not support this assertion with admissible evidence. Moreover, this dispute is immaterial to the merits of plaintiff's claims. Accordingly, there is no genuine dispute of material fact with respect to paragraph 4.

5. Plaintiff was again placed in NNRJ between May 8, 2017 and February 5, 2018. His allegations relate to a four-month period from September 12, 2017 to January 8, 2018.

6. During his previous periods of detention at NNRJ, plaintiff also exhibited aberrant behaviors at NNRJ, but, at that time, defendants were able to manage his behavior effectively.

7. In those previous periods of detention, plaintiff was regularly seen by QMHP Johnson, seen and treated after incidents of self-harm, and transported to the hospital if necessary.[12] During that time, depending on his condition, plaintiff was housed in the medical unit or in administrative segregation in a single cell.

8. Also, in accordance with NNRJ policy, staff periodically used the restraint chair for short periods of time to "modify [plaintiff's] behavior."[13]

## Facts Related to the Instant Suit

9. In mid-September 2017, plaintiff broke a sprinkler in his cell, causing a flood. He was charged with destruction of property, found guilty, and given fifteen days in the punitive segregation "N Pod." Plaintiff, however, did not want to be moved to N Pod, which restricted his access to certain items such as television.[14]

---

[12] Plaintiff claims that he was not invariably transported to the hospital "if necessary." See Dkt. No. 58, ¶ 3. He claims that he suffered significant injuries for which he should have been hospitalized but routinely was not. But plaintiff does not profess to be a medical professional with the training or knowledge to understand what types of injuries require hospitalization. Moreover, plaintiff does not cite to any admissible evidence in support of this narrative. Accordingly, plaintiff has not demonstrated the existence of a genuine dispute of material fact with respect to paragraph 7.

[13] Plaintiff denies that he was placed in the restraint chair for "short periods" and disputes that he was restrained in accordance with NNRJ policy. See Dkt. No. 58 ¶¶ 4-7. He fails to cite to admissible evidence in support of this narrative. Accordingly, plaintiff has not demonstrated the existence of a genuine dispute of material fact with respect to paragraph 8.

[14] Plaintiff disputes that he broke a sprinkler and argues that there is no evidence the sprinkler was ever broken. But defendants have offered evidence in the form of affidavits that a sprinkler was broken. See Hull Aff. ¶ 19 (Dkt. 47-1); Turner Aff. ¶ 7 (Dkt. 47-6). Also, defendants aver that plaintiff wanted to remain in administrative segregation where he was free to watch television. Plaintiff disputes that he was motivated by a lack of television and argues instead that his mental illness was to blame. See Dkt. No. 58. ¶¶ 8-11. Plaintiff's dispute regarding his motivations is totally immaterial to the merits of his claims, and he does not cite to any admissible evidence in support of his narrative. Accordingly, there is no genuine dispute of

10. Instead of going to N Pod, plaintiff desired to go to a suicide watch cell. When plaintiff's request was not granted, plaintiff smeared feces on his cell walls and on his face, cut his arm, and claimed to have inserted a foreign body into his penis.[15]

11. Around this time, QMHP Johnson routinely assessed plaintiff for a risk of suicide. When QMHP Johnson evaluated plaintiff, he found that plaintiff did not show signs of being depressed, manic, psychotic, or suicidal.[16]

12. Security checks in "N Pod," where plaintiff was housed, occur twice an hour per the Virginia Department of Corrections's policies. Although plaintiff was not designated to receive more frequent observation, NNRJ staff did periodically check on plaintiff more than twice an hour.[17]

13. On September 14, 2017, plaintiff was in a medical cell where he attempted to hang himself from the cell's light fixture using gauze. Mental health and medical staff evaluated plaintiff after this incident and, on September 16, 2017, transported plaintiff to Riverside Tappahannock Hospital.

---

material fact and paragraph 9 will include the undisputed facts as asserted by defendants.

[15] Plaintiff disputes defendants' characterization that he began to lash out *because* he was not placed in a suicide cell. Plaintiff's specific motivation for lashing out is immaterial to determining the constitutionality of defendants' actions. Accordingly, there is no genuine dispute of material fact with respect to paragraph 10.

[16] As presented, this fact has been edited to omit facts that the parties dispute. In their motion, defendants assert that plaintiff "refused to say if he was trying to kill himself." See Dkt. No. 47 ¶ 14. Plaintiff, however, asserts that defendant Johnson's own notes demonstrate that plaintiff was, in fact, suicidal. The medical documents submitted by defendants contain one sentence that reads, "[Plaintiff] [c]urrently in medical, reporting that he is going to hang himself." See Dkt. No. 47-4. Because this effectively disputes defendants' assertion that plaintiff "refused to say if he was trying to kill himself," see Dkt. No. 47 ¶ 14, that assertion is not accepted as an undisputed fact and has been omitted from paragraph 11. Ultimately, however, this dispute is not material to the resolution of any of plaintiff's claims.

[17] Plaintiff disputes the allegation by defendants that he was not designated to receive more frequent checks and asserts that he had been designated to receive security checks every fifteen minutes (but fails to allege who ordered those checks). He also states generally that, even if he was only on a two-checks-per-hour schedule, defendants did not abide by that schedule. But plaintiff does not cite to admissible evidence in support of his positions. Accordingly, there is no genuine dispute of material fact with respect to paragraph 12 and the fact appears here in the form offered by defendants.

14. On September 18, 2017, plaintiff threatened to cut off his testicles if he was moved to punitive segregation and, on September 20, threatened bodily harm to NNRJ staff. On September 20, Major Back ordered that plaintiff's cell be searched twice per day regardless of plaintiff's housing assignment. On September 21 plaintiff again threatened to cut off his testicles and attempted to destroy a light fixture.[18] Plaintiff was then physically restrained.

15. On September 22, 2017, an NNRJ officer reported that an existing wound on plaintiff's arm was bleeding. As plaintiff was transported to the emergency room, he stated: (i) that "he had plenty of tricks up his sleeve"; (ii) that the shift supervisor should inform Superintendent Hull that "he was going to make him lose his job"; and (iii) that "he was going to kill himself in N Pod."[19]

16. Up until September 22, 2017, Major Back and Captain Turner oversaw the logistics of plaintiff's confinement and periodically authorized use of the restraint chair but kept Superintendent Hull abreast of the situation.

17. As plaintiff's threats and acts of self-harm continued, and as customary means of addressing plaintiff's behavior proved ineffective, Major Back and Captain Turner collaborated with Superintendent Hull more closely.[20]

---

[18] Plaintiff admits that he threatened to cut off his testicles on September 18, 2017, but disputes using this act to avoid a move to punitive segregation. See Dkt. No. 58 ¶¶ 26-27. He further admits to threatening bodily harm to NNRJ staff on September 20, 2017 but attempts to justify this behavior by stating that "staff knew plaintiff had no history of ever assaulting staff members." See id. at ¶ 29. Once more, this dispute is immaterial to the resolution of defendants' motion. Accordingly, there is no genuine issue of material fact as to paragraph 14 and the fact is therefore stated as alleged by defendants.

[19] Plaintiff disputes that he made any of the listed statements in paragraph 15 but fails to cite to admissible evidence in support of his position. Accordingly, plaintiff has not demonstrated the existence of a genuine dispute of material fact with respect to paragraph 15.

[20] Plaintiff disputes that defendants exhausted normal means of addressing his behavior and offers several alternative paths they could have taken. But plaintiff does not cite to any admissible evidence in support of his position. And in any case, plaintiff does not dispute that the customary means of addressing his behavior had proven ineffective. Accordingly, there is no genuine dispute of material fact with respect to paragraph 17.

18. Throughout their decades of experience, Major Back, Captain Turner, and Superintendent Hull had never encountered an inmate such as plaintiff.[21] They believed his escalating behavior was manipulative and undertaken with the goal of avoiding punitive segregation.

19. Superintendent Hull sought to balance the risks posed by plaintiff's acts of self-harm with the risks posed by NNRJ's efforts to stop that behavior. Accordingly, Superintendent Hull tried to employ "proactive strategies" to avoid requiring plaintiff to remain in the restraint chair at all times.[22]

20. For instance, Superintendent Hull suggested that plaintiff be placed in "safety mitts." Between September 22, 2017 and September 28, 2017 alone, however, plaintiff chewed through several pairs of these mitts.

21. On September 28, 2017, after chewing through a pair of safety mitts, plaintiff again threatened self-harm and was placed in the restraint chair. Later that day, an officer observed a piece of metal hanging from plaintiff's mouth. Plaintiff was assessed by medical and placed in the restraint chair. He was later x-rayed and taken to the hospital.

22. Dr. Cohen, a UVA psychiatrist evaluated plaintiff on September 28, 2017.

23. When plaintiff returned to NNRJ on September 29, 2017, Superintendent Hull directed staff to use additional restraints on plaintiff. Because the safety mitts alone had proven ineffective, Superintendent Hull suggested taping the mitts, placing plaintiff in additional clothing, and restraining his arms at the elbows to restrict access to his fingers.[23]

---

[21] Plaintiff disputes this fact and relays accounts of personal conversations regarding the apparent notoriety of NNRJ. None of this constitutes admissible evidence and plaintiff cannot dispute, based on his own knowledge of NNRJ, how the defendants perceived his behavior. Moreover, whether defendants had encountered an inmate like plaintiff is not material to plaintiff's claims. Accordingly, there is no genuine dispute of material fact with respect to paragraph 18.

[22] Plaintiff again disputes that defendants had exhausted other less restrictive options and lists a bevy of strategies that NNRJ could have but apparently did not employ. Plaintiff does not cite to admissible evidence. In any event, that defendants did not employ the strategies plaintiff would have preferred does not invalidate the asserted fact that defendants attempted strategies other than outright physical restraint to control plaintiff. Accordingly, there is no genuine dispute of material fact with respect to paragraph 19.

[23] Defendants assert that the extra clothing in which plaintiff was placed was a "fall style jacket." See Dkt. No. 47, p. 6. They aver that Exhibit 8 shows the style of that jacket. But, as plaintiff correctly observes, Exhibit 8 depicts coveralls, not a jacket. See id. at Ex. 8. And though plaintiff also contests defendants' characterization of the jacket, his description of it as a "puffy

24. At Captain Turner's direction, Lieutenant Newsome placed plaintiff in a jacket and taped plaintiff's arms to his sides.[24]

25. NNRJ staff next utilized a "waist strap with handcuffs on the side, and a waist chain." Major Back suggested a "bite helmet." These strategies also proved ineffective at restraining plaintiff. Next, Superintendent Hull purchased a "humane restraint helmet," which plaintiff promptly destroyed.[25]

26. At Superintendent Hull's request, QMHP Johnson again referred plaintiff to the UVA psychiatrist, Dr. Cohen.

27. QMHP Johnson concluded that plaintiff's behavior was consistent with a "malingering diagnosis," which entails faking or exaggerating symptoms for personal gain to get out of an adverse situation.[26]

28. QMHP Johnson also concluded that plaintiff did not intend to take his own life but instead intended to manipulate his circumstances. He therefore determined there was no basis for a temporary psychiatric detainment order.[27]

---

winter Carhart coat," see Dkt. No. 1 ¶ 96, does not give rise to a material dispute. Because the parties agree plaintiff was placed in additional restrictive clothing, the statement of undisputed fact in paragraph 23 reflects that fact.

[24] Plaintiff disputes defendants' characterization of how his arms were taped and states that, by taping his arms in this manner, defendants encircled his body in duct tape. Plaintiff cites to his verified complaint in support of this position. See Dkt. No. 1 ¶ 97. Plaintiff's characterization of this event paints a more severe picture than defendants' narrative but is not actually at odds with defendants' version of events; the parties agree that plaintiff's arms were restrained at plaintiff's sides. Accordingly, the fact asserted in paragraph 24 appears in the form offered by defendants.

[25] Plaintiff disputes having been placed in a bite mask and asserts that no evidence supports defendants' assertion that he was. The medical records (Dkt. No. 47-2) and defendants' affidavits, however, support the asserted fact. See Hull Aff. ¶ 36. Plaintiff cites to no admissible evidence to support his version of events. Accordingly, plaintiff has not demonstrated the existence of a genuine dispute of material fact with respect to paragraph 25.

[26] Plaintiff disputes that QMHP Johnson reached this conclusion, by stating that defendants fail to allege that their own psychiatrist diagnosed plaintiff with malingering. But this was not defendants' claim. Defendants merely assert that QMHP Johnson concluded that plaintiff's behavior was *consistent* with that condition. Accordingly, plaintiff has not demonstrated the existence of a genuine dispute of material fact with respect to paragraph 27.

[27] Plaintiff here asserts that he was a danger to himself and therefore qualified for a temporary

29. After several additional episodes of self-harm and destruction of NNRJ property carried out by plaintiff, Superintendent Hull authorized the use of four-point restraints on or about October 21, 2017. Superintendent Hull ordered that plaintiff be secured in a helmet and be restrained to his bunk. The restraints were reinforced with duct tape. Superintendent Hull further ordered plaintiff to be checked twice an hour and "walked around every three hours." Plaintiff was removed from restraints for meals and use of the restroom and bath facilities.[28]

30. When Officer Gray supervised plaintiff during meals, he removed plaintiff's restraints, kept watch over plaintiff, and made sure the restraints were placed on plaintiff again. Once, Officer Gray was called on a "Code 1033" to help another officer in another pod while plaintiff was eating. During the time plaintiff was unattended, plaintiff broke a zipper off of his coat. When Officer Gray returned from this incident, he checked to see if the restraints were still intact. Officer Gray never saw a broken zipper.[29]

31. On October 23, 2017, Dr. Cohen saw plaintiff a second time based on QMHP Johnson's referral. Dr. Cohen then diagnosed plaintiff with "disruptive, impulse-control, and conduct disorder with extensive self-injurious behavior." Cohen agreed with QMHP Johnson's assessment that plaintiff exhibited behavior consistent with borderline personality disorder and, possibly, anti-social personality disorder.

32. During the ensuing days, plaintiff chewed on his restraints and on his own shoulder, continued to insert foreign objects into his bodily orifices, and cut himself. All told, plaintiff destroyed two hard shell helmets with face shields, ten pairs of security mitts, a pair of handcuffs, a pair of leg irons, two riot helmets, and a pair of coveralls.[30]

---

detention order but fails to cite to admissible evidence in support of his position. Accordingly, plaintiff has not demonstrated the existence of a genuine dispute of material fact with respect to paragraph 28.

[28] Plaintiff cites to his verified complaint to assert that defendants used duct tape to restrain him. Defendants' Exhibit 2 also demonstrates that NNRJ utilized duct tape to reinforce plaintiff's restraints. The amount of duct tape utilized to restrain plaintiff is immaterial to the resolution of plaintiff's claims. Accordingly, no genuine dispute of material fact exists with respect to paragraph 29.

[29] Plaintiff notes that he broke a zipper off of his coat when Officer Gray left him unattended. Plaintiff's and defendants' asserted facts are not incompatible with each other. Accordingly, there is no genuine dispute of material fact, but the asserted fact will be modified to reflect the additional information asserted by plaintiff with respect to paragraph 30.

[30] Plaintiff disputes that he chewed on "every" type of restraint as defendants aver but admits to

33. On October 26, 2017, NNRJ staff provided plaintiff with disposable underwear and pants because plaintiff continually urinated and defecated in his bunk, requiring jail officers to clean up his waste routinely.[31]

34. Provision of the disposable underwear came at the direction of Captain Turner.[32]

35. During this period, plaintiff was consistently seen by medical staff, who examined and x-rayed plaintiff. Dr. Dudley, who worked at Tappahannock Hospital and NNRJ, regularly ordered plaintiff sent to the hospital between the dates of September 13, 2017 and January 8, 2018.

36. Dr. Dudley saw plaintiff in the emergency room on September 13, 16, and 22, 2017; on October 17; November 15; and December 5, 2017. Other physicians provided emergency room care to plaintiff on September 29, 2017; October 6 and 14, 2017.

37. Dr. Jeffrey Haskins, a board-certified urologist, operated on plaintiff on September 13, 18, and 20, 2017; on December 5, 2017; and January 8 and 17, 2018.

38. On November 6, 2017, an x-ray showed the presence of a foreign body in plaintiff's pelvis. A follow-up x-ray three days later showed that the item remained inside of plaintiff. NNRJ staff conducted two more x-rays on November 10 and 13, 2017.

39. On November 15, 2017, after plaintiff was found with cuts on his arm and hand, NNRJ staff ordered x-rays which revealed the presence of metal in plaintiff's neck and penis, as well as the same metallic object seen in the November 10 and 13 x-rays. Plaintiff was

---

having chewed on several restraints and to destroying others. Plaintiff's parsing of which security items he destroyed with his mouth as opposed to by other means is immaterial. Accordingly, no genuine dispute of material fact exists with respect to paragraph 32.

[31] Plaintiff disputes that officers "routinely" cleaned up after him but does not cite to any admissible evidence in support of his position. Thus, no dispute of fact exists with respect to paragraph 33.

[32] In the asserted fact, defendants assert that plaintiff never complained that the underwear caused him pain. Plaintiff disputes that fact and cites to his verified complaint, Dkt. No. 1 ¶ 59. Plaintiff's complaint notes that plaintiff told Lieutenant Luna about the pain the underwear caused. Ultimately, this fact is immaterial, because plaintiff does not base his claims on the underwear he was given. Nonetheless, the fact in paragraph 34 is not presented in the form offered by defendants, because of the dispute raised by plaintiff's verified complaint.

then sent to the emergency room, where it was determined that the objects in plaintiff's abdomen would eventually pass naturally.

40. On December 3, 2017, Dr. Dudley saw plaintiff after an x-ray confirmed the presence of a sharp piece of metal in the shape of a triangle attached to a string in plaintiff's urethra. On December 5, Dr. Dudley attempted to extract the metal, but plaintiff could not tolerate the pain it caused. Later that afternoon, Dr. Dudley was working in the emergency room and again, alongside Dr. Haskins, attempted to remove the metal, this time with the aid of sedation and different instruments. The doctors successfully removed the metal and prescribed plaintiff antibiotics to prevent an infection.

41. After the December 5, 2017 procedure, Dr. Haskins conducted a literature review regarding treatment for foreign bodies present in the penis. He shared with Dr. Dudley an article stating that, if urine flow through the urethra was not blocked, it was the standard of care to exercise "watchful waiting." Dr. Dudley determined that plaintiff also could have "milked" the foreign bodies out of his penis.

42. On December 13, 2017, Officers Laws Jr. and Laws Sr. were scheduled to monitor plaintiff. During that time, plaintiff broke a pair of shackles, inserted a piece of those shackles into his penis, and swallowed another piece. The presence of these items within plaintiff's body was confirmed by x-rays. When plaintiff coughed, NNRJ medical staff were able to remove the piece of metal from his airway.[33]

---

[33] Defendants submit that Officers Laws Jr. and Laws Sr. performed all of their required security checks, checked plaintiff's restraints, and searched plaintiff's cell. They further submit that plaintiff did not break his shackles during Officer Laws Sr.'s shift and that Officer Laws Jr. reported the broken shackles to Lieutenant Newsome as soon as he noticed them. See Laws Jr. Aff. (Dkt. 47-16); Laws, Sr. Aff. (Dkt. 47-15). In his complaint, on the other hand, plaintiff avers that, prior to breaking his shackles, he told Officer Laws Jr. "that voices in his head was [sic] telling him to do something real [sic] crazy to himself," in response to which Officer Laws Jr. smirked. Dkt. No. 1 ¶ 43. Plaintiff states that Officer Laws Jr. then skipped several of his "fifteen minute periodic observation checks" and at one point "did not show up for an hour or so." Id. at ¶ 47. He alleges that, eventually, Officer Laws Jr. "saw plaintiff's hands ripped scott free [sic] out of the mittens … [and] shook his head smirking and casually continued on his way." Id. at 48. Because both parties rely solely on self-serving affidavits, there is a genuine dispute of fact as to whether Officer Laws, Jr. performed the required checks. This dispute is material because it speaks to whether Officers Laws Jr. and Laws Sr. had knowledge of the potential harm plaintiff faced and whether those defendants then "failed to protect" plaintiff from that harm.

43. Despite the presence of metal in his penis, plaintiff's urine flow was unimpeded, and plaintiff showed no sign of infection. Based on Dr. Haskins's literature review, Dr. Dudley monitored plaintiff and ordered a new x-ray on December 22, 2017.

44. In early January 2018, an NNRJ nurse advised Superintendent Hull of Dr. Dudley's determination that the risks regarding foreign bodies in plaintiff's penis were minimal provided urine flow was unimpeded. Superintendent Hull then reassessed how to balance his efforts to restrain plaintiff from self-harm and the actual harm plaintiff was accomplishing.[34]

45. With that medical knowledge in mind, Superintendent Hull decided plaintiff did not need to be restrained to protect him from self-harm. From January 8, 2018 onward, the restraints were removed.

46. That same day, Superintendent Hull sent plaintiff to the hospital, where Dr. Haskins was unable to remove the foreign body from plaintiff's penis. Haskins attempted once more on January 17, 2018 and was successful.

47. The USMS transferred plaintiff out of NNRJ on February 8, 2018.

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of

---

[34] Plaintiff disputes that defendants' treatment of him was "consistent and or proper." Dkt. No. 58, p. 33. He cites to state laws and claims defendants violated those laws by not allowing him to see mental health professionals at any hour of the day he pleased. Id. But plaintiff fails to cite to admissible evidence in support of his narrative of events. Additionally, the section of the Virginia Administrative Code plaintiff cites states only that "emergency medical and mental health care" shall be *available* at any time. See 6 VAC § 1310 (emphasis supplied). Accordingly, plaintiff has not demonstrated the existence of a genuine dispute of material fact with respect to paragraph 44.

law, the nonmoving party "must show that there is a genuine dispute of material fact for trial …

by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v.

Fairview Prop. Inv'rs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for

summary judgment, a district court should consider the evidence in the light most favorable to

the nonmoving party and draw all reasonable inferences from those facts in favor of that party.

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

### III. Analysis

Plaintiff's complaint is poorly organized and difficult to comprehend. The document is

divided into several sections titled "Claim and Cause of Action," but plaintiff fails to label these

causes of action and instead merely repeats legal buzzwords under each subheading.

Accordingly, defining each claim plaintiff attempts to state and against which defendant is a tall

order. A deferential reading of plaintiff's complaint demonstrates that plaintiff seeks relief on

the following grounds: (i) equal protection under the Fourteenth Amendment; (ii) deliberate

indifference to serious medical needs under the Fourteenth Amendment; (iii) failure to protect

under the Fourteenth Amendment; (iv) use of excessive force under the Fourteenth Amendment;

(v) conditions of confinement under the Fourteenth Amendment; and (vi) several forms of

negligence under Virginia state law.[35]

In line with the analysis that follows, summary judgment shall enter in defendants' favor

with one exception. Plaintiff has demonstrated the existence of triable issues of fact as to his

---

[35] Plaintiff's incoherent complaint makes it difficult to determine precisely what claims are brought against which defendants. The analysis here largely follows defendants' construction of plaintiff's claims. In opposition to defendants' motion for summary judgment, plaintiff did not contest defendants' conclusions as to which claims are asserted against which defendants.

claims of failure to protect and state law negligence against Officer Laws Jr. As to those claims and that defendant, summary judgment must be denied.

## A.    **Equal Protection**

Plaintiff claims defendants Superintendent Hull, Major Back, Captain Turner, and QMHP Johnson violated his right to equal protection by failing to provide him housing in a "constant observation cell," as plaintiff alleges they did for other inmates. See Dkt. No. 1 ¶ 85. The Equal Protection Clause of the Fourteenth Amendment protects against arbitrary classifications by state actors and ensures that all similarly situated individuals will be treated in the same way. U.S. CONST. amend. XIV. To succeed on an equal protection claim, a plaintiff must show that (1) he was treated differently from others (2) who were similarly situated and (3) that this unequal treatment was the result of intentional or purposeful discrimination. See Plyer v. Doe, 457 U.S. 202 (1982); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

In his verified complaint, plaintiff alleges that he "was the only [inmate] categorically not allowed constant observation. [He] watched and heard inmates get whisked to a constant observation cell from punitive segregation time and time again with absolutely no hesitation." Dkt. No. 1 ¶ 85. Plaintiff states that defendants' failure to provide him the same treatment enabled him to commit acts of self-harm unimpeded. Id. Although the information in plaintiff's verified complaint is properly considered in opposition to defendants' motion for summary judgment, to survive a motion for summary judgment a plaintiff "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Plaintiff has not done so here. His allegation that he was treated differently from other inmates is devoid of context, specificity, or factual support. Plaintiff's behavior was plainly bizarre and it is difficult to imagine other inmates who are substantially similar.

Although plaintiff asserts that other unnamed inmates were taken to "constant observation cells" when they threated to harm themselves, plaintiff does not identify those inmates, the nature of those inmates' self-harm claims, the dates of these occasions, or any other information that would demonstrate those inmates were "similarly situated" to plaintiff. Consequently, there is insufficient admissible evidence to create a material dispute of fact as to this claim. See, e.g., Pronin v. Johnson, 628 F. App'x 160 (4th Cir. 2015) (finding summary judgment appropriate for equal protection claim where plaintiff had alleged only that he was Jewish and that his cellmate was Hispanic, thereby not providing any evidence in support of the "similarly situated" or "intent" prongs of the equal protection test); Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a ... motion for summary judgment."); Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985) (finding plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places ... It's all around us" was conclusory and therefore insufficient to satisfy the requirements of Fed. R. Civ. P. 56(e)). Defendants are therefore entitled to summary judgment as to plaintiff's equal protection claims.

## B.     Deliberate Indifference to Serious Medical Needs

Next, plaintiff appears to claim that Superintendent Hull, Major Back, Officer Laws Jr., Officer Laws Sr., Captain Turner, Lieutenant Newsome, Director Dameron, Dr. Dudley, EMT Barnes, and QMHP Johnson were deliberately indifferent to his serious medical needs. To state a constitutional claim relating to medical care while a pretrial detainee, a plaintiff must first demonstrate that he suffered an injury that is both apparent and serious. Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). He must then demonstrate deliberate indifference toward that

injury on the part of the defendants. "Deliberate indifference is a very high standard—a showing

of mere negligence will not meet it." Id. at 695. To meet this burden, a plaintiff must show that

a defendant "had actual knowledge of the prisoner's serious medical needs and the related risks,

but nevertheless disregarded them." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018)

(citing Scinto v. Stansberry, 841 F.3d 219, 225-26 (4th Cir. 2016)). Significantly, a prisoner's

disagreement with medical personnel over the course of his treatment is inadequate to state a

constitutional cause of action. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); see also

United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011). Moreover, the Fourth Circuit has

sensibly held that supervisory prison officials are entitled to rely on the professional judgment of

trained medical personnel and may be found to have been deliberately indifferent to a prisoner's

medical needs only through a showing that they intentionally denied access to care or interfered

with medical treatment ordered by medical personnel.[36] Plaintiff has failed to demonstrate the

existence of a genuine dispute of material fact as to this claim. Although any number of

plaintiff's self-inflicted wounds would satisfy the seriousness prong of this test, plaintiff cannot

establish that defendants were deliberately indifferent to those injuries and his need for medical

care.

Of the defendants that plaintiff names with regard to this claim, only Dr. Dudley, EMT

Barnes, and QMHP Johnson are medical professionals. The record evidence demonstrates that

they did not act with deliberate indifference. Indeed, Dr. Dudley routinely examined plaintiff,

both at NNRJ and at Tappahannock Hospital. Dr. Dudley ordered x-rays for plaintiff and

---

[36] See Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) ("[I]t would be an unprecedented extension of the theory of supervisory liability to charge these wardens not only with ensuring that Gwendolyn received prompt and unfettered medical care, but also with ensuring that these subordinates followed proper medical procedures.").

referred plaintiff to a urologist related to plaintiff's self-inflicted penile injuries. On December 5, 2017, at NNRJ, Dr. Dudley unsuccessfully attempted to extract a piece of metal from plaintiff's urethra. Later that day, at the hospital, Drs. Dudley and Haskins worked together to remove it.

Plaintiff seems to take significant issue with Dr. Dudley's decision to monitor plaintiff—rather than seeking immediate surgical care—from mid-December to January of 2018, a period in which plaintiff lived with a foreign body in his urethra. Dr. Dudley's decision to take this course of action was the result of a dialogue with Dr. Haskins, a urologist, who determined that the presence of a foreign body in plaintiff's urethra was not cause for significant concern provided plaintiff's flow of urine was unimpeded. And Dr. Dudley did more than merely wait for a development or change in plaintiff's health during the period in question. Instead, Dr. Dudley ordered x-rays of plaintiff to determine the status and location of the foreign body inside of plaintiff; he actively monitored plaintiff's health after consulting with an expert in the field. In addition, there is no evidence to suggest that Dr. Dudley had any knowledge that plaintiff was in any degree of pain and ignored that information during this time period.

Plaintiff may disagree with Dr. Dudley's decisions, but plaintiff's layperson disagreement with his course of treatment does not suffice to support a constitutional claim.[37] Rather, plaintiff's allegations regarding Dr. Dudley's actions amount to no more than a claim of medical malpractice, which does not equate to a constitutional violation. See Banks v. Gore, 738 F. App'x 766, 771 (4th Cir. 2018) ("We see no evidence that [the defendant] deviated from the accepted standard of care, but even if he did, that would not be sufficient to clear the "high bar"

---

[37] See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (holding that "[d]isagreements between an inmate and a physician over the inmate's proper medical care" are not sufficient to raise an Eighth Amendment claim); see also United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011).

of a constitutional claim.") (citing <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014) (which itself states that "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference")). In this case, the record makes clear that Dr. Dudley was not deliberately indifferent to plaintiff's medical needs, and summary judgment will therefore enter in Dr. Dudley's favor as to this claim.

The same can be said for defendant QMHP Johnson. QMHP Johnson consulted with plaintiff at least weekly and reported his findings regarding plaintiff's mental health to NNRJ staff. QMHP Johnson twice referred plaintiff for psychiatric evaluations. Plaintiff takes issue with QMHP Johnson's conclusion that plaintiff was not suicidal but was instead manipulative and conducting self-harm to receive certain forms of treatment or housing. But, again, this disagreement with the course of treatment or care provided by a clinical professional does not support a constitutional claim. <u>See Wright</u>, 766 F.2d at 849. The record makes abundantly clear that QMHP Johnson sought to understand and assist plaintiff, even if plaintiff does not agree with QMHP Johnson's methods or conclusions. Accordingly, there is no viable claim against QMHP Johnson, and summary judgment will enter in his favor.

Summary judgment must enter in favor EMT Barnes for the same reasons. In his complaint, plaintiff alleges that "from December 13, 2017 to January 8, 2018," he received "no pain medication or antibiotics or any medical attention whatsoever." Dkt. No. 1 ¶ 61. Plaintiff continues, "[t]here was absolutely no blood pressure or temperature checks. No vitals, no nothing [sic]." <u>Id.</u> at ¶ 68. Plaintiff claims that, in this time period, he informed EMT Barnes of the pain he suffered from the presence of a shackle in his penis in and that he felt he had a fever and an infection. Dkt. No. 1 ¶ 62. Plaintiff contends that "[a]n ever quiet and poker faced EMT Barnes never made any comment." <u>Id.</u> at ¶ 64. Plaintiff also asserts that EMT Barnes never

sought "to report, investigate, inquire [or] diagnose plaintiff." Id. at ¶ 68. Each of these facts

fails to establish that EMT Barnes was deliberately indifferent to plaintiff's serious medical need.

To begin with, the undisputed record on summary judgment establishes that, although

EMT Barnes was aware of plaintiff's medical treatment, EMT Barnes was not involved in

plaintiff's medical care. The undisputed factual record also demonstrates that, at the same time

plaintiff alleges EMT Barnes failed to act, plaintiff was receiving medical treatment from other

medical professionals. Specifically, logs show that, on December 13, 2017, NNRJ staff provided

plaintiff with an EKG test and took plaintiff's vitals, each of which returned normal results. See

Dkt. No. 47-3. The same exhibit shows that plaintiff was provided Nizoral antifungal cream

twice a day starting January 4, 2018. Id. Additionally, plaintiff does not explain how he knows

that EMT Barnes took no steps to report plaintiff's complaints. In the face of such undisputed

evidence, plaintiff's self-serving affidavit and speculations are insufficient to establish a genuine

issue of fact and survive summary judgment.[38] Moreover, EMT Barnes was entitled to rely on

the treatment provided by other medical professionals.[39] Importantly, plaintiff offers no

evidence that EMT Barnes failed to treat any condition that was not already receiving some type

of treatment. This will not suffice to support a claim. "When the plaintiff *is* receiving medical

care from physicians and nurse practitioners, as here, it is not enough to speculate or to simply

disagree with a particular course of conduct. There must be evidence that a defendant *knew* there

---

[38] See Larkin v. Perkins, 22 F. App'x 114, 115 (4th Cir. 2001) (noting the district court properly found a party's "own, self-serving affidavit containing conclusory assertions and unsubstantiated speculation" insufficient to stave off summary judgment); Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995) ("Mere unsupported speculation ... is not enough to defeat a summary judgment motion.").

[39] See Miltier, 896 F.2d at 854; Rodriguez v. Lee, No. 7:12-cv-268, 2013 WL 2444011, at *3 (W.D. Va. June 5, 2013) ("Nurse Riley is entitled to rely on doctor's prescribed course of treatment.").

was a substantial risk of harm if the right treatment was not followed." Allen v. Frank, No. 05-C-975, 2006 WL 1876971, at *4 (E.D. Wis. July 3, 2006) (emphasis added). Here, plaintiff has failed to make such a showing. That EMT Barnes did not provide additional treatment outside of the EKG, vitals test, x-ray examinations, and antifungal cream already provided to plaintiff does not demonstrate he was indifferent to plaintiff's needs. See Jenkins v. Stirling, No.5:14-cv-2711, 2014 WL 5529769, at * (D.S.C. Oct. 31, 2014) ("[T]hat they did not perform all procedures or provide additional treatment that Plaintiff desires does not mean that they were indifferent to his medical needs."). Consequently, summary judgment will enter in favor of EMT Barnes.

The only remaining defendants in this claim, Superintendent Hull, Major Back, Officer Laws Jr., Officer Laws Sr., Captain Turner, Lieutenant Newsome, and Director Dameron, are not medical professionals. As to most of these defendants, there is no admissible evidence that suggests defendants interfered with plaintiff's medical care or that these defendants failed to refer plaintiff for care when it was needed. Evidence of this variety is necessary to prevent entry of summary judgment for this type of claim because plaintiff was already receiving continuous care from mental and physical health professionals, see Miltier, 896 F.2d at 854, and plaintiff's failure to proffer such evidence dooms his claim as to these defendants.

Only the claim against Major Back warrants further discussion. In his verified complaint, plaintiff asserts that, when informed about the presence of a shackle in plaintiff's penis, Major Back stated, "I'll send you to the hospital when I'm good and ready! Maybe the pain will make you think twice next time!" Dkt. No. 1. ¶ 74. Plaintiff avers that he then waited nearly thirty days before he was sent to the hospital. Id. at ¶ 75. Standing alone, this type of evidence could justify denial of summary judgment as to this claim. Here, however, plaintiff was already under the care of physicians. See Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979) (finding non-

medical defendants absolved selves of liability by referring ill inmate to medical staff). At the time of this alleged statement, Drs. Dudley and Haskins had already concluded that the appropriate course of treatment was to watch and wait to see if the foreign body would pass naturally. Not only were doctors monitoring plaintiff, but they ordered x-rays to determine whether the foreign body moved inside plaintiff and to ensure that plaintiff's urine flow remained unimpeded. Consequently, Major Back did not actually prevent plaintiff from receiving any treatment. Instead, Dr. Dudley's watchful waiting plan carried on without interruption. On this basis, one could not conclude that Major Back interfered with the provision of plaintiff's medical care. See DePaola v. Clarke, 394 F. Supp. 3d 573, (W.D. Va. 2019) (granting summary judgment where there was no evidence non-medical defendant knew plaintiff was not receiving the necessary care; defendant "was entitled to rely on the professional decisions of the mental health staff"). Absent this showing, this claim fails, and summary judgment must enter in favor of Major Back. See Miltier, 896 F.2d at 854.

Even assuming that Major Back's conduct did cause some delay in plaintiff's treatment, plaintiff does not allege any specific harm that was the result of Major Back's inaction. Courts recognize that delay in medical care, with no resulting injury, does not support a claim for deliberate indifference. See Webb v. Hamidullah, 281 F. App'x 159, 16 (4th Cir. 2008) (noting that "[o]ur unpublished decisions recognize that a delay . . . does not necessarily constitute deliberate indifference, absent some resultant harm or a worsened condition").[40] Accordingly, summary judgment must also enter in favor of Major Back for this separate reason.

****

---

[40] See also Mendoza v. Lynaugh, 989 F.2d 191, 193 (5th Cir. 1993); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.1985) (holding that delay must result in harm).

In summary, the record makes clear that defendants did not act with deliberate indifference towards plaintiff's medical or mental health needs. Plaintiff expresses discontent with the treatment he received, but that alone does not establish that defendants acted in violation of the Constitution and its requirements. Summary judgment must be entered in favor of defendants with respect to this deliberate indifference as to a serious medical need claim.

## C.     Failure to Protect / Excessive Force / Conditions of Confinement

There is an inherent tension between plaintiff's remaining constitutional claims, because, on the one hand, plaintiff claims that defendants failed to protect him by effectively monitoring him or restraining him, while on the other hand, plaintiff claims that defendants did too much to restrain him and to monitor him. The Fourth Circuit has recognized the "tightrope" that prison officials in such circumstances are forced to walk and that defendants "face the prospect of a lawsuit no matter which way they turn." Grayson v. Peed, 195 F.3d 692, 696-97 (4th Cir. 1999). Nonetheless, defendants' responses in each instance – acting to protect plaintiff from himself and avoiding restrictions that are excessive or cruel and unusual – must still fall within the parameters of the Constitution. Because defendants suggest they sought to restrain plaintiff in response to his self-injurious behavior, it will first be examined whether, from a constitutional perspective, defendants failed to protect plaintiff from self-harm. Thereafter, it must be determined whether defendants' efforts to do were an unconstitutional use of excessive force or created unconstitutional conditions of confinement.

### i.     *Failure to Protect* [41]

It appears that plaintiff charges defendants Officer Gray, Officer Laws Jr., Officer Laws Sr., Lieutenant Newsome, QMHP Johnson, Major Back, Captain Turner, and Superintendent

---

[41] Plaintiff's claims are difficult to categorize. After consideration, however, it appears that

Hull under a theory of failure to protect. See Dkt. No. 1 ¶ 83(A)-(G). The Due Process Clause of the Fourteenth Amendment—not the Eighth Amendment—protects the rights of pretrial detainees such as plaintiff. Hill v. Nicodemus, 979 F.2d 987, 990-91 (4th Cir. 1992). Nevertheless, the same standard applies to a failure to protect claim under the Fourteenth Amendment by a pretrial detainee as a claim under the Eighth Amendment by a convicted prisoner. See, e.g., Perry v. Barnes, No. PWG-16-705, 2019 WL 1040545, at *3 (D. Md. Mar. 5, 2019) (citing Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001); Goodman v. Kimbrough, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013)).

To prove a § 1983 claim against officials for failing to protect him from injury, including self-injury, the plaintiff must establish (1) that he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) that the defendant prison official had a "sufficiently culpable state of mind," one of "deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994); see also Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992). Deliberate indifference entails "more than ordinary lack of due care for the prisoner's interests or safety," and "more than mere negligence," but "less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835.

An inmate may prove deliberate indifference through direct or circumstantial evidence, and "[d]irect evidence of actual knowledge is not required." Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015). The plaintiff may satisfy the deliberate indifference element with evidence that the challenged circumstances created a "substantial risk" of harm that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the

---

"delayed hospitalization" claims are best categorized under the medical indifference framework, because an act causing injury has already taken place. The failure to protect doctrine considers actions taken or not taken by defendants *before* harm is done.

circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." Id. Even without direct evidence, "an injury might be so obvious that the factfinder could conclude that the [official] did know of it because he could not have failed to know of it." Id. Here, plaintiff relies on circumstantial evidence.

It is not seriously contested that plaintiff represented a serious threat to his own wellbeing; examples of his determination to harm himself litter the summary judgment record. Instead, the dispute on this failure to protect claim is whether defendants, or any single defendant, exhibited the requisite deliberate indifference despite knowledge of plaintiff's self-harming tendencies.

To begin with, plaintiff's complaint focuses chiefly on defendants' decision to place plaintiff in punitive segregation instead of on "constant observation" in a medical cell. In this respect, plaintiff essentially argues that this decision is per se deliberative indifference. But the summary judgment record does not reveal whether there are any differences between the level of observation that NNRJ required of plaintiff and the level of observation that plaintiff would have received in a medical cell. Moreover, that defendants did not provide plaintiff precisely the type of attention he felt he deserved does not mean that defendants were indifferent to the risk he posed to himself; defendants undeniably devoted significant amounts of time and resources to monitoring plaintiff. Accordingly, plaintiff's framing of the argument, namely that not placing him in a constant observation cell constituted per se deliberate indifference, is incorrect and no reasonable jury could find that this decision alone constituted deliberate indifference. See Veney v. Wyche, 293 F.3d 726, 734 (4th. Cir. 2002) ("In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the

particular safety and security concerns facing" inmates). The actions of each individual defendant must therefore be assessed separately.

With respect to Superintendent Hull, plaintiff does not identify a specific action that Superintendent Hull failed to take to protect plaintiff from his acts of self-injury and the summary judgment record reveals none. Instead, the summary judgment record demonstrates that Superintendent Hull was kept informed of plaintiff's activities by Major Back and Captain Turner and that, on September 22, 2017, Superintendent Hull became more involved in directly planning plaintiff's care and observation. Superintendent Hull sought to prevent plaintiff from remaining in the "restraint chair" for extended periods and devised other means to prevent plaintiff from harming himself. For instance, Superintendent Hull initially suggested plaintiff be placed in "safety mitts" to prevent plaintiff from using his hands to harm himself. When plaintiff repeatedly chewed through the mitts, Superintendent Hull suggested staff use duct tape to reinforce the mitts. When that failed, Superintendent Hull suggested plaintiff be placed in extra layers of clothing. Superintendent Hull referred plaintiff for psychological evaluations and ultimately ordered plaintiff be restrained via four-point restraints on his bed. On this record of action designed to restrict plaintiff's ability to harm himself, it is apparent that Superintendent Hull, far from acting with deliberate indifference, made reasonable and progressive efforts to prevent plaintiff from committing acts of self-harm. See Farmer, 511 U.S. at 825 (holding that "a prison official cannot be found liable [for deliberate indifference] unless the official knows of *and disregards* an excessive risk to inmate health or safety") (emphasis supplied). Accordingly, summary judgment must issue in favor of Superintendent Hull on plaintiff's failure to protect claim.

Nor can defendant QMHP Johnson be held liable on this theory. Here again, plaintiff does not identify a specific act that QMHP Johnson failed to take that would have protected plaintiff from an injury. Rather, the summary judgment record demonstrates that, in response to plaintiff's acts of self-harm, QMHP Johnson, as a qualified mental health professional, routinely assessed plaintiff and repeatedly came to the conclusion that plaintiff had no actual intent to take his own life. QMHP Johnson instead concluded that plaintiff's behavior, while self-destructive, was aimed to manipulate NNRJ staff into providing him with the housing arrangement he desired. Further, the summary judgment record reflects that QMHP Johnson devoted substantial time, effort, and energy to meet with plaintiff, evaluate his mental state, and relay that information and his conclusions to other NNRJ staff, including medical staff. Moreover, QMHP Johnson also referred plaintiff to a University of Virginia psychiatrist for evaluation. Thus, the record reflects that QMHP Johnson, far from exhibiting deliberate indifference to plaintiff's condition, actively confronted them and made reasonable efforts to prevent plaintiff from injuring himself. Accordingly, summary judgment must enter in favor of QMHP Johnson on plaintiff's failure to protect claim. See Farmer, 511 U.S. at 825.

Similarly, the summary judgment record demonstrates that Major Back also did not act with deliberate indifference toward the risk of plaintiff committing acts of self-harm. Again, plaintiff fails to identify any specific act that Major Back failed to take which would have or could have protected plaintiff from an injury that he suffered. Indeed, after plaintiff threatened to cut off his testicles and inflict bodily harm on NNRJ staff, Major Back ordered that plaintiff's cell be searched twice daily. This action served to decrease the risk that plaintiff could acquire or possess any instrumentality with which to cause harm to himself or to NNRJ staff. Additionally, when plaintiff repeatedly broke free of his "safety mitts," Major Back

30

recommended the implementation of a "bite helmet" to prevent plaintiff from chewing on the restraints. Major Back therefore did not disregard risks posed by plaintiff but instead proposed actions and strategies to minimize or eliminate those risks. Accordingly, Major Back did not act with deliberate indifference toward plaintiff's propensity to injure himself and is entitled to the entry of judgment in her favor. See Farmer, 511 U.S. at 825.

Captain Turner and Lieutenant Newsome also demonstrated no deliberate indifference. Plaintiff asserts that Captain Turner failed to protect plaintiff by not putting plaintiff on suicide watch. Plaintiff has failed to come forward with facts establishing that placing him on suicide watch would have provided plaintiff with materially different protection and observation than what plaintiff received. Nor does plaintiff point to a specific injury that he suffered as a result of the failure to place him suicide watch. Similarly, plaintiff claims that Lieutenant Newsome failed to act to protect plaintiff from self-harm after plaintiff chewed through his protective mitts. Specifically, plaintiff asserts that Lieutenant Newsome delayed coming to plaintiff's cell after plaintiff chewed through his mitts and was able to insert portions of the metal shackle into his body. Plaintiff's own allegations establish that summary judgment in favor of Lieutenant Newsome is appropriate, because, by the time Lieutenant Newsome learned of the damage to the mitts, plaintiff had already injured himself. See Dkt. 1 ¶¶ 51, 55 (indicating that plaintiff was injured before Lieutenant Newsome was informed). Because Lieutenant Newsome had no opportunity to prevent plaintiff from injuring himself, plaintiff cannot establish that Lieutenant Newsome failed to protect plaintiff.[42]

---

[42] See, e.g.., Randall v. Prince George's Cty., Md., 302 F.3d 188, 204 (4th Cir.2002) (a plaintiff asserting failure to protect must show that the officer knows about the violation of Plaintiff's person and that he has a reasonable opportunity to prevent the harm, but he chooses not to act); Young v. Va. Dep't of Corr., No. 7:11-cv-213, 2011 WL 2140434, at *2 (W.D. Va. May, 31, 2011) (dismissing claim where no allegation that "any official could have intervened . . . in time

Next, the summary judgment record demonstrates that, far from being deliberately indifferent, Captain Turner and Lieutenant Newsome paid attention to and took reasonable steps to ameliorate the danger posed by plaintiff. Specifically, the record shows that Captain Turner conferred with Superintendent Hull regarding plaintiff's repeated breaches of restraints. At Superintendent Hull's direction, Captain Turner ordered Lieutenant Newsome to outfit plaintiff in additional layers of clothing and to further restrain plaintiff's arm movement with tape. Thus, the summary judgment record reflects that Captain Turner and Lieutenant Newsome took reasonable steps to protect plaintiff and did not disregard risks to plaintiff in their limited interactions with him. Plaintiff's allegations do not support a failure to protect claim against them, and judgment must be entered in their favor. See Farmer, 511 U.S. at 825.

Plaintiff contends that Officer Gray routinely left plaintiff alone during eating periods. Other than the specific incident involving plaintiff's zipper, however, plaintiff does not allege that any of these periods of no supervision resulted in any injury to plaintiff. Accordingly, the analysis here appropriately focuses solely on the incident in which, while left alone by Officer Gray, plaintiff successfully broke a zipper off of his coat and inserted it into his penis. On this occasion, Officer Gray was absent, for only a few minutes, to assist another officer for a "Code 1033," namely an officer in need of assistance alarm. Officer Gray's absence does not give rise to a failure to protect in these circumstances, because prison officials only have a duty to take "reasonable measures" to protect inmates. See Farmer, 511 U.S. at 825. It is not reasonable to expect correctional officers to ignore a call for assistance or an emergency involving another

---

to prevent the injury"); Fobbs v. City of Union City, No. 09-2723, 2011 WL 347119, at *7 (N.D. Cal. Jan. 31, 2011) (dismissing failure to protect claim, because "such duty to protect would necessarily occur prior to the fact of harm, not after).

officer. That is, it is unreasonable to ask Officer Gray to ignore a known danger – the Code 1033 call – in favor of a potential danger – the danger that plaintiff would injure himself.[43] Moreover, even if Officer Gray's decision to leave plaintiff alone to assist another officer presented a risk to plaintiff's wellbeing, plaintiff has offered only his conclusory allegation that Officer Gray was aware of plaintiff's self-harming tendencies. See Dkt. No. 1 ¶ 145 ("Officer Gray was acutely aware of plaintiff's risks and recent history."). In a failure to protect claim, a plaintiff must show that a defendant had knowledge of the risk a plaintiff faced and ignored that risk. Plaintiff's bare allegation that Officer Gray had such knowledge is insufficient to prevent the entry of summary judgment to the defendant as to this claim. See Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a ... motion for summary judgment."). No reasonable finder of fact could consider the summary judgment record and conclude that Officer Gray demonstrated the requisite mental state to be held liable under a failure to protect theory. Summary judgment therefore must be entered in Officer Gray's favor.

With respect to Officers Laws Jr. and Laws Sr., plaintiff alleges that, on December 13, 2017, he warned Officer Laws Jr. that he intended to "do something real crazy to himself." Dkt. No. 1 ¶ 43. Plaintiff alleges that Officer Laws Jr. merely smirked and walked away. Id. Officer Laws Jr. then allegedly skipped several of his observation checks, failing "to show up for an hour or so one [sic] occasion." Id. at ¶ 47. During this time, plaintiff claims to have been breaking free of his restraints. See id. at ¶¶ 44-47. Eventually, plaintiff states, Officer Laws Jr. returned, noticed that plaintiff had broken free of his mitts and shackles, and "shook his head smirking and

---

[43]See Aaron v. Reed, 2017 WL 693336, at *8 (S.D.N.Y. Jan. 23, 2017) (holding that there was no valid failure to protect claim where an officer left his post in response to a call for assistance from another officer).

casually continued on his way." Id. at ¶ 48. Once plaintiff succeeded in breaking his shackles, he claims that he took a "broken piece of shackle and jammed it down into his penis ... and then tied [another] piece ... on to the rear teeth in his mouth then eventually swallowed it." Id. at ¶ 51. Plaintiff alleges that, later that same day, he informed Officer Laws Sr. that he had ingested pieces of metal from his shackles and that, prior to telling Officer Laws Sr., Officer Laws Jr. had failed to conduct his scheduled checks or search plaintiff's cell despite having noticed that plaintiff had broken free of his restraints. See Dkt. No. 1 ¶¶ 52, 55. Plaintiff asserts that he was not taken to the hospital regarding these injuries until January 8, 2018, twenty-five days later. Id. at ¶¶ 61–62. Officers Laws Jr. and Laws Sr. categorically deny plaintiff's allegations but do so solely by relying on their own affidavits. At this juncture, it is inappropriate to determine the credibility of either party's sworn statement. Accordingly, this evidence establishes a genuine issue of fact, whether such dispute is material such that summary judgment must be denied is discussed below.[44]

A jury could reasonably consider these facts and conclude that Officer Laws Jr., who was aware of the danger plaintiff posed to himself, nevertheless left plaintiff unsupervised in a dangerous situation. Accepting plaintiff's version of the story as true, Officer Laws Jr. could have prevented plaintiff from inserting foreign bodies into his orifices had he promptly intervened when he noticed that plaintiff had escaped from his restraints. On the current summary judgment record, the alleged facts that plaintiff warned Officer Laws Jr. of his intention to "do something real crazy to himself" prior to causing himself injury are sufficient to

---

[44] It is conceivable that defendants submitted documentary evidence that tends to disprove this claim, but, having not been directed to any such evidence, and having not found such evidence in a thorough examination of defendants' submissions, this dispute reduces to one between dueling sworn statements.

establish a genuine issue of material fact as to whether Officer Laws Jr. failed to protect plaintiff from injury.

Although little case law exists that directly confronts facts quite like these, comparisons to other cases in which correctional facility guards have left their posts or skipped observation times support denying summary judgment as to this claim and this defendant. See, e.g., Orange v. Strain, 192 F.3d 125 (5th Cir. 1999) (overturning district court's grant of summary judgment for defendant where evidence showed plaintiff had warned defendant about impending fight and was attacked when defendant left his post without cause).[45] The facts of the instant case are analogous to those in Orange. In both, an inmate had warned a prison official, here Officer Laws Jr., of an impending risk. Despite the officials' knowledge of the risks, in both cases, those officials allegedly left their posts and thereby left the at-risk inmates unobserved. In both cases, injuries resulted.[46] Given this, on the current record, summary judgment must be denied with respect to plaintiff's failure to protect claim against Officer Laws Jr.

The facts plaintiff alleges with respect to Officer Laws Sr. are less compelling. Plaintiff's complaint reveals that, by the time Officer Laws Sr. started his shift, plaintiff had already inserted the foreign object into his body. Thus, the injury of which plaintiff complains was not caused by any failure to act by Officer Laws Sr. See, e.g., Randall, 302 F.3d at 204; Young, 2011 WL 2140434, at *2 (dismissing claim where no allegation that "any official could have

---

[45] See also Laube v. Haley, 234 F. Supp. 2d 1227, 1246 (M.D. Ala. 2002) (plaintiffs likely to succeed on merits of claim where there was inadequate supervision of inmates in the face of known danger).

[46] See also Riggins v. Stewart, 2019 WL 4725158, at *16 (S.D. Ala. Sept. 26, 2019) (issues of fact existed as to whether officer acted with deliberate indifference when he left his post and plaintiff sustained injury).

intervened . . . in time to prevent the injury).   Consequently, summary judgment must issue in favor of Officer Laws Sr. as to this failure to protect claim.

****

Contrary to plaintiff's contention, the summary judgment record makes clear that a majority of the defendants in this case worked diligently and reasonably to confront the danger that plaintiff posed to himself. Given this, summary judgment is appropriate in favor of all defendants on plaintiff's failure to protect claims, except for Officer Laws Jr.

  ii.  _Excessive Force_

Plaintiff also appears to assert that several defendants employed excessive force against him through the use of physical restraints.  He alleges that, "[s]ometime near the midpoint of October 2017 ... Major Back, Superintendent Hull, Captain Turner, Luetenant [sic] Newsome, Luetenant [sic] Luna, Sergeant Taylor [and] Sergeant Chatham ... ordered, directed, condoned, allowed plaintiff to be put in and maintained in five point restraints or the equivalent of [sic] and to be duct taped." Dkt. No. 1 ¶ 90.

It is well established that the Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment," Graham v. Connor, 490 U.S. 386, 395 n.10, (1989), and that is not "an incident of some other legitimate governmental purpose." Bell v. Wolfish, 441 U.S. 520, 538 (1979). In Kingsley v. Hendrickson, 135 S.Ct. 2466 (2015), the Supreme Court held that a pretrial detainee plaintiff must demonstrate "only that the force purposely or knowingly used against him was objectively unreasonable." 135 S.Ct. at 2473.  In determining whether the force was objectively unreasonable, a court considers the evidence "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing Graham, 490

36

U.S. at 396). "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Kingsley, 135 S. Ct. at 2474.

The record in this case demonstrates that the force used by defendants Major Back, Superintendent Hull, Captain Turner, Lieutenant Newsome, Lieutenant Luna, and Officer Taylor was not objectively unreasonable. Indeed, plaintiff's self-injurious behavior necessitated defendants' action.[47] Although the parties dispute whether plaintiff truly had suicidal intentions, it is undisputed that plaintiff routinely threatened to and actually did harm himself while in custody at NNRJ. Specifically, the record reflects that, before plaintiff was restrained using mittens or four-point restraints, plaintiff cut his arms, spread feces on his wall, tied gauze around his throat, and threatened to cut off his testicles. As noted above, defendants had a duty to protect plaintiff from self-harm. Accordingly, their use of some degree of force to restrain plaintiff was undoubtedly warranted.

Several of the Kingsley factors are pertinent here. Specifically, at issue are the factors concerning the relationship between the amount of force used and the need for that use of force, defendants' efforts to temper the severity of their force, and whether plaintiff was resisting defendants' efforts to maintain an orderly prison. See Kingsley, 135 S. Ct. at 2474. The record reflects that the amount of force defendants employed to restrain plaintiff was commensurate

---

[47] Plaintiff's decision to raise this claim alongside his "failure to protect" claim shows that plaintiff "wants it both ways." He simultaneously asserts that defendants did too much and too little to restrain him.

37

with the level of threat he posed to himself. Indeed, defendants increased the severity of the restraints on plaintiff only as plaintiff's attempts to break free of restraints and injure himself continued. Prior to the period of time on which this case is predicated, defendants initially confined plaintiff in a restraint chair for short periods in line with NNRJ policy. Defendants did not elect to restrain plaintiff in the restraint chair for extended periods and instead devised alternative strategies to deter plaintiff from injuring himself. Defendants first outfitted plaintiff with safety mittens, which plaintiff promptly destroyed on several occasions. After destroying these mitts, plaintiff continued to harm himself.

In response to plaintiff's destruction of the safety mittens (he chewed through them), Superintendent Hull suggested staff add a layer of tape on top of the mittens to provide additional security. Plaintiff successfully breached this additional tape layer, too. Superintendent Hull next suggested plaintiff be placed in a jacket and further secured at the elbows with tape. After this failed to prevent plaintiff from harming himself, Superintendent Hull suggested plaintiff be equipped with a helmet to prevent him from chewing on the restraints. After plaintiff broke multiple helmets and began to chew on his own shoulder, Superintendent Hull authorized the use of four-point restraints.

Put simply, the summary judgment record makes clear that defendants increased their use of force only as plaintiff continued to defeat various restraints and succeed in harming himself. In other words, defendants tempered their use of force until plaintiff demonstrated through staunch resistance that additional force was necessary to prevent him from harming himself or NNRJ staff. Accordingly, the Kingsley factors weigh in favor of defendants. See Iverson v. Leggett, No. 11-1108, 2013 WL 3972621, at *9 (W.D. Pa. July 30, 2013) ("[The] evidence demonstrates that Defendants' actions in taking control of Plaintiff's body, searching then

placing him in chain waist restraints was designed to defuse an escalating situation that, given Plaintiff's remarkable history of misconduct, could have impacted not only his own safety, but the safety of officers . . . . It follows that the force used to place Plaintiff in restraints was applied in a good-faith effort to maintain discipline . . . .").

Additionally, there is no evidence to suggest defendants' use of force in restraining plaintiff directly led to any physical harm. Instead, the record makes very clear that plaintiff took every opportunity to harm himself and that, absent defendants' efforts, plaintiff's acts would have continued largely unabated. Plaintiff does allege, though, that defendants' use of force led to mental and emotional harm. See Dkt. No. 1 ¶ 111. This type of injury is cognizable under § 1983. See Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 306-07 (1986) (§ 1983 damages may include compensation for such injuries as personal humiliation and mental anguish and suffering). But plaintiff's allegations of mental and emotional harm are strictly conclusory; plaintiff does not offer any significant detail as to the emotional harm he suffered or its connection to defendants' use of force. Even accepting as true plaintiff's allegation that he suffered some degree of mental anguish as a result of defendants' actions, this degree of alleged emotional harm is far from sufficient to outweigh the several Kingsley factors which are squarely in favor of defendants. Plaintiff's determination to harm himself warranted the defendants use of progressive restraints.

A review of the summary judgment record makes clear that that no reasonable jury could find that defendants acted in an objectively unreasonable manner through their application of the progressive use of force. Given this, judgment must enter in favor of defendants as to plaintiff's excessive force claim.

### iii.    _Conditions of Confinement_

Plaintiff next asserts that the decision to leave his cell constantly illuminated rendered the conditions of his confinement unconstitutional. He argues that, for over four months, defendants QMHP Johnson, Major Back, Captain Turner, and Superintendent Hull "ordered, sanctioned, condoned implicitly and/or explicitly their subordinate staff ... [to] leav[e] the blinding lights on ... for twenty four hours a day which made it virtually impossible for plaintiff to sleep and caused headaches." Dkt. No. 1 ¶ 113. Plaintiff further alleges that he repeatedly complained of this condition to defendants Officers Nelson, Buntin, Houchin, Smith, Ball, Gray and Tinder as well as Sergeant Taylor and Sergeant Chatham[48] who all allegedly stated that Major Back, Captain Turner, and Superintendent Hull demanded the lights stay on. Id. at ¶ 114.

Plaintiff's challenge to the constitutionality of his conditions of confinement as a pretrial detainee is determined by application of the test in Bell v. Wolfish, 441 U.S. 520 (1979). The test asks, "whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word." Id. at 538. "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Id.

Requiring inmates to live in constant illumination can, under certain circumstances, constitute "punishment" from a constitutional perspective. See, e.g., Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996). In that case, the plaintiff alleged that the constant illumination

---

[48] Of the NNRJ officials that plaintiff claims to have informed of this condition, only Sergeant Taylor was successfully served with plaintiff's complaint. Sergeant Chatham was previously dismissed after plaintiff failed to state a claim against him, see Dkt. No. 13, and waivers of service directed to Officers Buntin and Houchin were returned as undeliverable, see Dkt. Nos. 22, 24. Plaintiff did not name Officers Nelson, Smith, Ball, or Tinder as defendants in his complaint. See Dkt. No. 1.

caused him to suffer psychological problems. That is not the case here. Other courts, including this Court, have held that such constant illumination does not violate any constitutional rights.[49] In this case, it is perfectly reasonably for defendants to keep plaintiff under constant illumination as such an environment: (i) permits NNRJ staff to see plaintiff, the state of his restraints, and any injuries that he may have caused himself; and (ii) helps deter plaintiff from attempting to injure himself, because he is in view of the staff.

Here, the summary judgment record does not support the notion that defendants left the lights on for a punitive purpose. Instead, the facts demonstrate that plaintiff was committed to carrying out acts of self-harm whenever he had the opportunity. He admits as much in his complaint. See Dkt. No. 1 ¶ 40 (plaintiff's "modus operandi was to wait until he knew that no one was watching him ... and utilize that time to breach his restraints in order to harm himself"). Consequently, leaving the lights off would only have offered plaintiff additional opportunities to harm himself. This case resembles the facts of Chavarria, in which the Fifth Circuit found that there was no Eighth Amendment violation where "the lights were kept on . . . for security reasons." Chavarria, 102 F. App'x at 436. Similarly, here defendants created an environment in which they were better able to monitor plaintiff for evidence that he had, or was planning or attempting to commit, self-destructive acts.[50] Protection from harm of the individuals housed in

---

[49] See Murray v. Edwards Cnty. Sheriff's Dept., 248 F. App'x 993, 998 (10th Cir. 2007) (no violation where plaintiff failed to provide evidence of sufficiently serious harm); Chavarria v. Stacks, 102 F. App'x 433, 436 (5th Cir. 2004) (no violation where lights kept on for security reasons); Stephenson v. Diggs, No. 1:14cv266, 2015 WL 9450611, at *3-4 (E.D. Va. Dec. 22, 2015) (finding plaintiff failed to state a claim where he failed to allege that constant illumination caused any significant harm), and Foster v. Fisher, No. 1:14cv292, 2015 WL 3767622, at *4 (W.D.N.C. June 17, 2015) (finding no Fourteenth Amendment violation where "a fluorescent light and officers knocking on [plaintiff's] cell door made it difficult for [plaintiff] to rest for two nights").

[50] And such constant observation is what plaintiff claims to have wanted in the first place. Indeed, much of plaintiff's complaint is dedicated to grieving the fact that defendants opted not

a correctional facility constitutes a legitimate governmental purpose or motivation. Moreover, plaintiff only complains that the constant illumination caused headaches and made it difficult to sleep. See Dkt. 1 at 113. Such allegations are not sufficient to survive a motion for summary judgment. See Murray, 248 F. App'x at 998 (allegations of that constant illumination "disturbed his sleep and that he suffered headaches as a result" were not "sufficiently serious to sustain a claim"). No reasonable fact finder could look at the factual record in this case and determine that defendants left the lights on in plaintiff's cell in order to punish him or that plaintiff was seriously injured because of the constant illumination. Rather, it was perfectly appropriate for defendants to use constant illumination to enable guards to prevent plaintiff from injuring himself and to deter plaintiff from injuring himself. Accordingly, summary judgment must enter for defendants as to this claim.

**D.**     **State Law Negligence**

Finally, plaintiff alleges that defendants were negligent, grossly negligent, or even willfully and wantonly negligent in the manner in which they monitored, contained, and treated him. To say that plaintiff uses these terms (i.e. negligence, gross negligence, willful and wanton negligence) liberally would be an understatement. Consequently, determining where plaintiff actually seeks to pursue state law negligence claims and where plaintiff invokes the word negligence in a conclusory fashion for the sake of argument is difficult. It is therefore somewhat understandable that defendants simply argue that "[t]he undisputed facts ... wholly undermine plaintiff's claims." See Dkt. No. 47, pp. 29-30.

---

to place him in a suicide-watch cell and instead decided to move him to segregation. Plaintiff argued that only constant observation would suffice to protect him from himself. His grievance that defendants left the lights on, which enhanced defendants' ability to monitor plaintiff more closely, demonstrates the untenable position in which plaintiff placed defendants.

"The elements of an action in negligence are a legal duty on the part of the defendant, breach of that duty, and a showing that such breach was the proximate cause of injury, resulting in damage to the plaintiff." Blue Ridge Service Corp. of Va. v. Saxon Shoes, Inc., 271 Va. 206, 218 (2006) (citing Trimyer v. Norfolk Tallow Co., 192 Va. 776, 780 (1951)). Absent some external legal or relationship-based requirement, individuals owe each other only "the degree of care an ordinarily prudent person would use in a similar situation to avoid injury to another." Cowan v. Hospice Support Care, Inc., 268 Va. 482, 486 (2004).

Gross negligence, meanwhile, is "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." Cowan v. Hospice Support Care, Inc., 268 Va. 482, 487 (2004). Because "the standard for gross negligence [in Virginia] is one of indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." Elliott v. Carter, 292 Va. 618, 622 (2016).

Finally, willful and wanton negligence, the highest degree of negligence, involves a person acting either (1) with conscious disregard for the rights of another or (2) with knowledge that such conduct could result in harm to another under the circumstances. Griffin v. Shively, 227 Va. 317, 322 (1984).

For plaintiff's claims to survive summary judgment, then, the record must offer, at a minimum, some evidence that defendants failed to act reasonably under the circumstances and that their failure to do so resulted in some injury to plaintiff.[51] The analysis of plaintiff's other claims has already necessitated consideration of defendants' actions in this case. No reasonable

---

[51] In this case, the injuries that plaintiff endured were self-inflicted. The evidence must therefore allow for a finding that defendants' acts or omissions enabled plaintiff to inflict those injuries.

fact-finder could examine the evidentiary record and conclude that those actions were to blame for plaintiff's admittedly successful self-injurious behavior. The summary judgment record is replete with evidence that defendants exerted reasonable and appropriate effort designed to prevent plaintiff from injuring himself. They physically restrained plaintiff, made reasonable efforts to observe him closely, and ordered psychiatric evaluations on several occasions. That plaintiff, by virtue of determined efforts and maneuvers, was able to injure himself does not demonstrate that defendants' behavior was inappropriate, let alone negligent or grossly negligent.

This analysis applies to all but one defendant, Officer Laws Jr. In line with the analysis set out regarding plaintiff's claim of failure to protect, the record leaves open the possibility that a fact finder could conclude that the behavior of Officer Laws Jr., on the day of December 13, 2017, was unreasonable and contrary to his duty to protect plaintiff and that his behavior enabled plaintiff to commit an act of self-harm, specifically by inserting foreign bodies into his orifices. See Reid v. Newton, No. 3:13-cv-572, 2014 WL 1493569, at *14 (E.D. Va. Apr. 14, 2014) (holding that negligence claim based on self-harm could go forward where prison officials knew of danger and failed to perform their jobs with reasonable care). Indeed, the failure to protect claim requires a showing of deliberate indifference, a higher standard of culpability than that of simple negligence. See Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) ("An official is deliberately indifferent ... when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety' .... That is a higher standard of culpability than mere negligence or even civil recklessness."). In that light, on this factual record, a fact finder might reasonably find that Officer Laws Jr. acted in a grossly negligent manner.[52]

---

[52] There is no admissible evidence, however, that would support a finding that these defendants

44

Plaintiff next argues that QMHP Johnson, by virtue of his status as a mental health professional, owed plaintiff an additional fiduciary duty beyond the duty individuals generally owe to each other. See Dkt. No. 1 ¶ 83(E). Plaintiff's conclusory statement that QMHP Johnson breached his duty by "tr[ying] to downplay [plaintiff's problems] so as to be able to provide legal cover for," his bosses, see Dkt. No. 1 ¶ 83(E), will not suffice to support a claim. This statement is vague and fails to explain any connection between defendant QMHP Johnson's behavior and the injuries plaintiff ultimately accrued. The record makes very clear that QMHP Johnson routinely visited and assessed plaintiff and even referred plaintiff to a specialist on more than one occasion. Summary judgment will be entered on defendant QMHP Johnson's behalf as to this claim.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment must be granted in part and denied in part. Given the voluminous and incoherent nature of the complaint, however, it is conceivable that defendants may not have identified all of the evidence relevant to the two claims against Officer Laws Jr. that survive summary judgment. To that end, defendants shall be provided an opportunity to renew their motion for summary judgment and to provide additional evidence to the extent it is available.

An appropriate order will issue separately.

---

acted with willful and wanton negligence. Plaintiff has not shown that defendants acted with knowledge that their actions could lead to harm. Accordingly, summary judgment as to that claim shall be entered across the board.

The Clerk is directed to send a copy of this Memorandum Opinion to plaintiff and to counsel of record for defendants. The copy designated for plaintiff is not to be bound using any paperclips, staples, or other objects plaintiff could use to harm himself.

Entered this _20th_ day of _March_ 2020.

Alexandria, Virginia

/s/

T. S. Ellis, III
United States District Judge